PAUTZ, Plaintiff in error, v. STATE, Defendant in error.

*No. State 246.   Argued June 4, 1974.—Decided June 28, 1974.*
(Also reported in 219 N. W. 2d 327.)

470

472

For the plaintiff in error there was a brief by *Howard B. Eisenberg,* state public defender, and *Garrett N. Kavanagh,* assistant state public defender, and oral argument by *Mr. Kavanagh.*

For the defendant in error the cause was argued by *Christine M. Wiseman,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

BEILFUSS, J. The primary issue in this matter is whether the defendant established, by the greater weight of the credible evidence, that he lacked mental responsibility at the time he caused the death of Judith Pautz. The jury and the trial court decided this issue in the negative.

The defendant elected to be tried under the A. L. I. test of insanity as set forth in sec. 971.15, Stats.

"971.15 **Mental responsibility of defendant.** (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

"(2) As used in this chapter, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

"(3) Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence."

The defendant's proof of insanity rests almost entirely on the testimony of the psychiatrist and the psychologist who testified as expert witnesses at the trial.

Dr. Albert Lorenz, who was the court-appointed psychiatrist, testified that to a reasonable medical certainty the defendant, Dale Pautz, on March 17, 1972, as a result of mental disease or defect, lacked the substantial capacity

either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. He further testified that to a reasonable medical certainty there was no possibility that the defendant's mental condition with respect to his ability to conform his conduct to the requirements of the law could have changed from the time he first entered the Arlyn Pautz home on the afternoon of March 17, 1972, until he left.

The other expert witness, Dr. Richard Purdy, a clinical psychologist who was called by the defense (the state called no expert witnesses), testified it was his opinion that the defendant was suffering from a mental disease to such an extent that, even though he knew the difference between right and wrong, he was unable to control his behavior or his conduct within the requirements of the law.

Defendant argues that in light of such evidence the trial court erred in denying his motion to set aside the jury's verdict. This court discussed this type of issue in *State v. Bergenthal* (1970), 47 Wis. 2d 668, 685, 686, 178 N. W. 2d 16, saying:

". . . The defendant here had the burden to prove his insanity by the greater weight of the credible evidence. The state did not have the duty to present evidence as to defendant's sanity. The issue as to sanity remained for resolution by the trier of fact. The issue of credibility of witnesses and of whether the defendant had met his burden of proof in establishing the defense of insanity was for the jury to determine. Even without the right of the jury to have and to consider the testimony of the court-appointed doctors, as above sustained, the weight to be given the testimony adduced by the defendant was for the jury to determine. On the record here, direct and cross-examination included, a reasonable juror could find the defendant sane at the time of the commission of the crimes without reliance upon the testimony of the court-appointed experts. The question of whether the defendant had met his burden of proof was one of fact for the jury,

not one of law for the court." *See also: Kemp v. State* (1973), 61 Wis. 2d 125, 137, 211 N. W. 2d 793.

"In *Sprague v. State* (1971), 52 Wis. 2d 89, 99, 187 N. W. 2d 784, this court again stated the following rule:

" 'This court has held that it is the responsibility of the trier of fact to determine the weight and credibility of medical testimony on the issue of insanity and to determine whether the defendant has met the burden of proving he was insane. *State v. Bergenthal* (1970), 47 Wis. 2d 668, 178 N. W. 2d 16. Where there is sufficient credible evidence to support the finding of the jury, it will not be upset on appeal. *McCool v. State* (1971), 51 Wis. 2d 528, 187 N. W. 2d 206. . . .' " *Beavers v. State* (1974), 63 Wis. 2d 597, 217 N. W. 2d 307.

"The jury could accept or reject the testimony of the experts. . . ." *Schwalbach v. Antigo Electric & Gas, Inc.* (1965), 27 Wis. 2d 651, 658, 135 N. W. 2d 263.

"As the court observed in Jones v. N. V. Nederlandsch-Amerikaansche Stoomvaart M., 374 F. 2d 189, 190 (3d Cir. 1966), cert. denied, Holland American Line v. Philadelphia Ceiling & Stevedoring Co., 388 U. S. 911, 87 S. Ct. 2114, 18 L. Ed. 2d 1349 (1967), the opinion of an expert, even if uncontradicted, is not required to be accepted as such testimony must pass through the screen of the fact trier's judgment of credibility." *United States v. Pittman* (7th Cir. 1971), 449 Fed. 2d 623, 628.

The record discloses several bases on which the jury could seriously question and reject the testimony of the experts. The most striking piece of evidence in conflict with the experts' testimony and supporting a finding of sanity is the defendant's own handwritten and signed confession given within hours after the murders. The confession, which is quite extensive, indicates in great detail the planning and execution of the murder of Judith Pautz. Thus, this confession, which on its face shows premeditated murder, would in itself support the jury's finding of sanity and the trial court's approval.

In making their diagnoses, both doctors relied almost entirely on information provided to them by the defend-

ant. The bases of their opinion and the credibility of these experts and their diagnoses could be questioned on this ground alone. This becomes even more evident when we note the great disparity between the account of the incidents as told in defendant's confession and the account that he gave the doctors. He told them that he became angry when Judith told him to sweep the floor. The doctors apparently assumed the truth of defendant's story as he told it to them.

Furthermore, the doctors did not examine the defendant until more than four months after the incidents. It would not be unreasonable for the jury to believe that the stories and information given to the doctors were self-serving and contrived. This is especially true in view of the fact that defendant expressed to the doctors that he hoped "to get off with a light sentence," and that his great fear was where he was going to go.

Dr. Lorenz testified that he diagnosed defendant as having an "aggressive personality" or an "explosive personality" and the crime could not have been a deliberate plan on defendant's part.

Defendant's confession, however, shows the murder of Judith Pautz to be deliberately planned. In that confession defendant stated: "After I talked to her on the phone on Thursday, March 16, 1972, I decided I would kill Judy because I had the feeling all girls hated me." Thus, the theory of the doctors as to defendant's "explosive personality" is inconsistent with his confession to the murder of Judith Pautz. The trial court discussed this conflict, saying:

". . . his action throughout that entire day from the time that he got up until the time that he stuck the knife into the back of Judy Pautz, were consistent with a pre-thoughtout, premeditated and pre-planned murder, and that there was no explosive reaction with respect to the murder of Judith Pautz, as was normal, I think the doctor testified, when you considered the psychiatric condition

of an explosive reaction. However, once he got into the frenzy of stabbing Judith Pautz, the way he did, and his half brother being there, it's understandable I would assume, and the jury must have so reasoned, that he was then in an explosive reaction due to the fighting back that had been done by Judith Pautz, and the reaction of the half brother, Douglas Pautz, and that it was then that he got into the explosive reaction about which the doctor testified and it would be then on that basis, that jury in effect acquitted him of the murder of Douglas Pautz and found him guilty of the murder of Judith Pautz. . . ."

As noted by the trial court, this case is very similar to the New Jersey case of *State v. Coleman* (1965), 46 N. J. 16, 214 Atl. 2d 393, wherein the jury found the defendant guilty of the first-degree murder of his wife and not guilty by reason of insanity as to the murder of his sister-in-law. The New Jersey Supreme Court resolved the issue, stating at page 43:

"The jury was at liberty to reject any portions of the aforementioned testimony which they discredited and to consider the evidence before it in the light of human experiences and understandings. Thus it could fairly conclude that the defendant had quarreled with his wife, she was about to leave him, and in anger or desperation but while sane within *M'Naghten*, he killed her. It could also fairly conclude that, the shocking deed having been done, he then went berserk and aimlessly killed and wounded others while insane within *M'Naghten*. We, of course, cannot be certain as to the internal processes which actually occurred for, as the psychiatrists themselves would readily acknowledge, they do not have all the answers. But clearly the jury's diverse treatment of the two killings does not offend common sense nor result in any unfairness or injustice; we find no basis for upsetting the guilty verdict under indictment No. 405 as inconsistent with or contradictory to the verdict under indictment No. 406."

On behalf of the defendant it should be noted that Dr. Lorenz, who sat through the trial, was recalled and asked

whether the additional evidence adduced at trial had in any way changed his opinion as to the defendant's mental condition and that the doctor stated his opinion had been made stronger. However, the jury could within its province reject this part of his testimony.

In light of the above it cannot be said that the jury was unreasonable in finding that the defendant did not meet his burden of proof.[2]

Lastly, defendant asks that this court grant him a new trial in the interest of justice, citing *Kemp v. State, supra.* While this case is somewhat similar to *Kemp,* it is clearly distinguishable. Kemp had an extensive history of psychiatric problems prior to the murder—such history is lacking here. In *Kemp* the mental disorder matched the nature of the crime—here that issue is in great dispute to say the least. And, most conclusively, Kemp did not even remember the crime—here, the defendant signed a confession not only clearly recounting the incidents but also indicating his clear intent to commit such a crime.

We do not believe that the weight of the testimony in this case is such that ". . . justice has probably miscarried and that it is probable a new trial will result in a contrary finding." *Kemp, supra,* page 137.

*By the Court.*—Judgment and order affirmed.

---

[2] It was stated by counsel for the defendant at oral argument that the defendant was not raising an issue as to inconsistent verdicts. It is obvious that such a claim would be fruitless in light of *State v. Mills* (1974), 62 Wis. 2d 186, 214 N. W. 2d 456.